UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| BRUCE COUTURIER and ELEANOR COUTURIER,<br><br>    Plaintiffs,<br><br>    v.<br><br>AMERICAN INVSCO CORP.; NICHOLAS GOULETAS; CONDOMINIUM RENTAL SERVICES, INC.; KOVAL FLAMINGO, LLC; REBEKAH DESMET; and MERIDIAN PRIVATE RESIDENCES CH, LLC,<br><br>    Defendants. | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND DENYING REQUEST FOR HEARING[2]<br><br><br><br>Case No. 2:12-cv-01104-APG-NJK<br><br>[Dkt. Nos. 64, 112] |
| SHAHIN EDALATDJU and NASILA EDALATDJU,<br><br>    Plaintiffs,<br><br>    v.<br><br>AMERICAN INVSCO CORP.; NICHOLAS GOULETAS; KOVAL FLAMINGO, LLC; CONDOMINIUM RENTAL SERVICES, INC.; REBEKAH DESMET; and MERIDIAN PRIVATE RESIDENCES CH, LLC,<br><br>    Defendants. | Case No. 2:12-cv-01106-APG-NJK<br><br>[Dkt. Nos. 59, 94] |

---

[2] This single Order resolves the pending motions to dismiss filed on June 18, 19, and 20, 2013 in the six captioned cases. The names of the plaintiffs and the record citations below refer to case number 2:12-cv-01104-APG-NJK, but they are interchangeable with the plaintiffs and record citations in the other five cases.

| | | |
|---|---|---|
| 1 | MARY HELDT; VICTOR HELDT; and SNAP PROPERTIES, LLC, | Case No. 2:12-cv-01107-APG-NJK |
| 2 | | |
| | Plaintiffs, | [Dkt. Nos. 68, 100] |
| 3 | | |
| | v. | |
| 4 | | |
| | AMERICAN INVSCO CORP.; | |
| 5 | NICHOLAS GOULETAS; KOVAL FLAMINGO, LLC; CONDOMINIUM | |
| 6 | RENTAL SERVICES, INC.; and MERIDIAN PRIVATE RESIDENCES | |
| 7 | CH, LLC, | |
| 8 | Defendants. | |
| 9 | NASIR KOSA; BASIR KOSA; and SAID MATTI, | Case No. 2:12-cv-01108-APG-NJK |
| 10 | | |
| | Plaintiffs, | [Dkt. Nos. 58, 92] |
| 11 | | |
| | v. | |
| 12 | | |
| | AMERICAN INVSCO CORP.; | |
| 13 | NICHOLAS GOULETAS; KOVAL FLAMINGO, LLC; CONDOMINIUM | |
| 14 | RENTAL SERVICES, INC.; REBEKAH DESMET; and MERIDIAN PRIVATE | |
| 15 | RESIDENCES CH, LLC, | |
| 16 | Defendants. | |
| 17 | FRANK TADDEO and AMELIA TADDEO, | Case No. 2:12-cv-01110-APG-NJK |
| 18 | | |
| | Plaintiffs, | [Dkt. Nos. 68, 96] |
| 19 | | |
| | v. | |
| 20 | | |
| | AMERICAN INVSCO CORP.; | |
| 21 | NICHOLAS GOULETAS; KOVAL FLAMINGO, LLC; CONDOMINIUM | |
| 22 | RENTAL SERVICES, INC.; and REBEKAH DESMET, | |
| 23 | | |
| | Defendants. | |

2

| | |
|---|---|
| WISAM B. KOSA; RAGHID B. KOSA; and MAHA KOSA,<br><br>    Plaintiffs,<br><br>v.<br><br>AMERICAN INVSCO CORP.; NICHOLAS GOULETAS; KOVAL FLAMINGO, LLC; CONDOMINIUM RENTAL SERVICES, INC.; and MERIDIAN PRIVATE RESIDENCES CH, LLC,<br>    Defendants. | Case No. 2:12-cv-01111-APG-NJK<br><br>[Dkt. Nos. 52, 86] |

Defendant Koval Flamingo, LLC ("Koval") filed a motion to dismiss (Dkt. No. 64), which was joined by American Invsco Corporation ("Invsco"), Condominium Rental Services, Inc. ("CRS"), Nicholas Gouletas ("Gouletas"), Meridian Private Residences CH, LLC ("Private Residences"), and Rebekah Desmet ("Desmet"). (Dkt. Nos. 65, 68, 69.) For the reasons set forth below, the motion is granted in part and denied in part. In addition, Plaintiff's rogue motion entitled "Motion for Oral Hearing on Order Shortening Time on All Motions Pending Longer than 60 Days" (Dkt. No. 112) is denied as improper.

I.  **BACKGROUND**

This case arises from the purchase of a condominium (the "Condo") in the Meridian complex in May 2005, pursuant to a Purchase Agreement between buyers Bruce and Eleanor Couturier (the "Couturiers" or "Plaintiffs") and seller Koval.[3] Immediately prior to the purchase, the Meridian complex had been converted from apartments into condominiums. Nearly simultaneous with the purchase in May 2005,[4] the Couturiers leased the Condo to CRS, an entity

---

[3] The Couturiers purchased two condominium units, but the relevant contract documents are purported to be the same. The Court thus discusses the matter as if one unit was purchased, relying on the contract documents for Unit 06-323 unless otherwise indicated.

[4] Although the relevant documents were executed several weeks apart, the precise dates do not matter for purposes of this Order. (Dkt. No. 61 at 42, 61, 63, 66–67.) Therefore, the Court treats the Purchase Agreement and the first CRS Lease Agreement as executed simultaneously.

3

distinct from Koval. The Couturiers gave CRS the authority to sublease. In essence, they hired CRS as a rental/property manager, but instead of directly contracting for that purpose they leased the Condo to CRS with the concurrent right to sublease.

At the termination of CRS's two-year lease in May 2007, the Couturiers agreed to a three-year lease extension with CRS that would run through March 2010. CRS agreed to the extension on the condition that the Couturiers contract with Koval for approximately $30,000 in new furniture and other unspecified upgrades to the Condo. At the beginning of 2008, CRS informed the Couturiers that it could no longer perform under the lease. In February 2008, the Couturiers signed a new "Condominium Resort Lease" with Private Residences. This lease similarly Private Residences (as the tenant) the authority to sublease. The arrangement apparently fell apart when, among other things, Private Residences defaulted.

The Couturiers now claim that Koval and Invsco breached the May 2005 Purchase Agreement. The Couturiers assert that Invsco was the developer of the condominium conversion, was involved in the sales and management of the condo units, and was Koval's agent in the purchase transaction. The Couturiers also claim that CRS and Koval breached the May 2007 lease extension and that Private Residences breached its February 2008 lease. The Couturiers next claim that CRS, Private Residences, and Koval (in its own capacity and as Invsco's principal) breached the implied covenant of good faith and fair dealing. The Couturiers further claim that Invsco, Koval, CRS, and Desmet (an alleged employee or agent of at least one of the Defendants), committed conversion by not providing the upgraded furniture as contracted. Finally, the Couturiers claim that Koval, Invsco (as Koval's agent), and Gouletas (an alleged owner and developer of the Meridian condominiums), fraudulently concealed the fact that the floor coverings installed during the apartment-to-condominium conversion exceeded the building's load-bearing capacity.

Defendants seek to dismiss the Couturiers' First Amended Complaint ("FAC") for a variety of reasons.

## II. ANALYSIS

### A. Legal Standard – Motion to Dismiss

A properly pleaded complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a complaint must "contain[] enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 696 (internal quotation marks and citation omitted).

District courts must apply a two-step approach when considering motions to dismiss. *Id.* at 679. First, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from the complaint in the plaintiff's favor. *Id.*; *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247–48 (9th Cir. 2013). Legal conclusions, however, are not entitled to the same assumption of truth even if cast in the form of factual allegations. *Iqbal*, 556 U.S. at 679; *Brown*, 724 F.3d at 1248. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678.

Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 663. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged--but it has not shown--that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and citation omitted). When the claims have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the [district] court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

On a motion to dismiss under Rule 12(b)(6), courts ordinarily consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### B. Vicarious Liability (Agency) / Alter Ego Liability

The Couturiers have sufficiently pleaded that Invsco acted as Koval's agent for the sales transaction. The following allegations are sufficient to give rise to a reasonable inference that Invsco was Koval's agent: (i) the Couturiers met with two Invsco employees, Josette Culverwell and Amber Morelli, during the initial sales meeting at the Meridian offices; (ii) Invsco informed the Couturiers that although Meridian was owned by Koval (presumably referring to title ownership), Invsco and Gouletas were the owner and developer of the conversion project; and (iii) Invsco advertised that it and Gouletas had acquired the Meridian apartments and would shortly be converting them into condominiums. *See Iqbal*, 556 U.S. at 663. But this determination may not give the Couturiers the result they desire. The general rule is that a principal is vicariously liable for the authorized actions of her agent but not vice-versa. *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1111 n.53 (C.D. Cal. 2009) (quoting *Rookard v. Mexicoach*, 680 F.2d 1257, 1261 (9th Cir. 1982) ("An agent, absent fault on his part, cannot be vicariously liable for the wrongful acts of his principal.")). Thus, Invsco's wrongful acts are attributable to Koval, but Invsco is not vicariously liable for any malfeasance by Koval.

The Couturiers have not pleaded alter ego liability. Nor have Defendants asserted that they are anything other than distinct entities that acted in their own stead. Therefore, the Court will dismiss any defendant who is named under a claim for relief without any basis for direct liability or vicarious liability as to that claim for relief.

### C. Release from Liability — The February 2008 Lease

The February 2008 lease between the Couturiers and Private Residences contains a release from liability for claims arising before the lease was executed. (*See* Dkt. No. 64-1 at 4.) The Couturiers argue various infirmities with the release, none of which is well-founded. Among other things, there are no facts to support unconscionability. Also, Private Residences, Koval, CRS, and Invsco are intended third-party beneficiaries under the lease. *See Canfora v. Coast*

*Hotels & Casinos, Inc.*, 121 P.3d 599, 605 (Nev. 2005) (internal quotations marks and citation omitted); *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824–25 (Nev. 1977) (citations omitted).

The Court, however, will not yet rely on the release to dismiss any claims. As set forth below, the claim alleging breach of the February 2008 lease survives, and if Private Residences breached that contract then the release may be unenforceable. *See Coughlin v. Trans World Airlines, Inc.*, 847 F.2d 1432, 1434 (9th Cir. 1988).

### D. First Claim for Relief – Breach of Purchase Agreement

The Couturiers contend that Invsco and Koval breached the May 2005 Purchase Agreement by (i) failing to provide an easement to the "front entry way" on Flamingo Ave.; (ii) failing to turn over the clubhouse that was used as a sales office; (iii) failing to construct the units in the appropriate quality; (iv) failing to obtain building permits for electrical and water heater installations and failing to meet building code for those installations; (v) failing to construct the units in accord with the building's load-bearing capacity; (vi) attempting to cause the Couturiers to waive the implied covenant of habitability in violation of Nevada statute; and (vii) failing to use licensed contractors.

#### 1. Access to Flamingo Entry Gate

The Couturiers allege that the land under the Flamingo Road entrance (the apparent main entrance to the condo complex) is designated as Parcel No. 162-21-501-007 and owned by FC Income Properties, LLC ("FC Income"). (FAC Par. 27.) They further allege that the land was leased to Koval and is not under the control of the condos' Homeowner's Association ("HOA"). In June 2008, when Private Residences allegedly stopped paying rent and the County assessed $560,000 back taxes for the unpermitted use of the Condo as an overnight hotel, FC Income allegedly blocked access to the complex through the Flamingo entrance. Essentially, the Couturiers claim that Koval, in the Purchase Agreement, covenanted to provide access through the Flamingo entrance and thereby had an ongoing obligation to pay the land lease for the entryway regardless of whether HOA dues were paid or not (because the HOA was not the lessee of the land under the Flamingo entryway).

Defendants counter that the Purchase Agreement did not adopt the Covenants, Conditions, and Restrictions ("CC&Rs") in their entirety but rather adopted only the "additional disclosures and disclaimers" in the CC&Rs. (Dkt. No. 64 at 5.) Therefore, they contend, any reliance by the Couturiers on the language in the CC&Rs about the entrance gate is misplaced. Defendants also argue that the publicly-recorded Plat for the Meridian complex establishes that the Flamingo entrance is not part of the Project.

In relevant part, the Purchase Agreement provides:

> **1.1** The PROPERTY ... shall consist of (a) the ... condominium unit ... , (b) an undivided fractional interest as tenants in common in the Common Elements ... , (c) the right to use, possess and occupy the Assigned Parking Space and other Limited Common Elements serving such Unit exclusively, as described in the Condominium Map and/or the recorded Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for the Project, as may be amended from time to time ("CC&Rs"), appurtenant to and for the exclusive use of the Unit ... , (e) *a non-exclusive right and easement of ingress and egress over and across the Project entry area* and all private streets, and of use and enjoyment in, to and over the Common Recreational Area and other Common Elements throughout the Project; all in accordance with and subject to the Plat, the Association Governing Documents, and all easements, covenants, conditions, restrictions and other matters of record, and the Association Rules and Regulations.
>
> * * *
>
> **8.1** As of the date of this Agreement, Seller has delivered to Purchaser a draft of the CC&Rs. . . . Purchaser agrees that he/she will assume and hereby assumes, as of the date of Closing, the obligations of a Unit Owner under the CC&Rs.
>
> * * *
>
> **41. Exhibits and Riders.** All Exhibits and Riders attached hereto are incorporated herein and made a part hereof provided they are signed by both parties.

(Dkt. No. 61 at 25–42 (emphasis supplied).)

Defendants are correct that the Purchase Agreement does not expressly adopt the CC&Rs wholesale. Nor do the Couturiers allege that the CC&Rs were attached to the Purchase Agreement as an exhibit or rider signed by both parties. However, the Couturiers must comply with the obligations of a "Unit Owner" under the CC&Rs and Koval must comply with whatever obligations are required of a former "Unit Owner," if any, under the CC&Rs.

8

The Purchase Agreement itself provides that the Project includes a right of "ingress and egress over and across the Project entry area." It is reasonable to infer that this right relates to the entryway from Flamingo Road. That entry, which includes a guard gate, appears to be the main entrance to the Project. For purposes of a motion to dismiss, it is reasonable to believe that a purchaser, like the Couturiers, would expect the Purchase Agreement's reference to "the Project entry area" to refer to the Flamingo Road entry.

Moreover, the Plat does not contradict the Couturiers' allegation that Koval was the lessee of the entryway land and thus had sole control over whether the related lease was timely paid. As to the entryway land, the Plat states: "Leasehold parcel recorded August 1, 1990 . . . ." (Dkt. No. 64-3 at 2.) The Plat simply corroborates what the Couturiers allege: that the land was owned by another and subject to a leasehold. The Couturiers need not rely on the CC&Rs to sufficiently plead this claim. Based on the alleged facts, which the Court must deem as true, it is plausible that Koval breached section 1.1 by not maintaining ongoing ingress/egress through the Flamingo entryway. The resulting harm was that the lessor blocked access to the easement for lack of payment. However, Invsco cannot be liable for this instance of breach because it cannot be vicariously liable for its principal's conduct. Thus, while this claim may be maintained against Koval, it cannot be maintained against Invsco.

### 2. Turnover of Clubhouse

In pertinent part, the Purchase Agreement provides:

> **12. Sales Promotion/Construction Rules.** For the purposes of completing sales promotion of Meridian Private Residences, Seller, its agents, successors and assigns, are hereby given full right and authority to maintain on the Condominium Property . . . *until 90 days after transfer of title of the last Unit at the Condominium Property*, signs, sales offices, condominium association office, and model units, together with the rights of ingress and egress therefrom for Seller and any of Seller's employees, agents, licensees, or invitees, as more fully set forth in the Condominium Documents . . . .

(Dkt. No. 61 at 50 (emphasis supplied).)

The Couturiers claim that Koval and Invsco breached this provision by failing to turn over the clubhouse that was used for sales purposes. This amounts to a conclusory allegation of the necessary elements of a claim for relief, which is insufficient under *Iqbal*. 556 U.S. at 678. The

9

Couturiers do not allege that the title of the last Unit has been transferred, which is a condition precedent to the Seller's relinquishment of its sales office. Defendants argue that the clubhouse was part of the "Commercial Area," and that the Nevada Supreme Court has already held that Koval had no duty to return this area to the common-interest community. *Koval Flamingo, LLC v. Meridian Private Residences Homeowners Ass'n*, No. 54804, 2011 WL 2139947 (Nev. May 26, 2011). However, the Court need not reach the issue of whether the clubhouse was within the Commercial Area because this instance of breach is insufficiently pleaded on its face.

### 3. Construction Quality

The Couturiers rely on section 15.1 for this alleged instance of breach:

> **15.1.** Purchaser acknowledges and agrees that the Unit is on [*sic*] condominium unit within the condominium development Project, and that the Project is a condominium conversion of improvements which have been used as an apartment complex for more than twelve (12) years. As such, *the Unit has been constructed with materials and workmanship . . . typical to production quality condominium housing in the market area and price range.*

(Dkt. No. 61 at 50.) The Couturiers then leap to the conclusion that Koval and Invsco breached by "failing to construct the units in the quality of condominium units in the area." (FAC Par. 61) The Couturiers fail to allege any facts to explain how their units are sub-par in quality with respect to the standard articulated in section 15.1. This is merely a conclusory allegation that does not satisfy the pleading standards of *Iqbal* and *Twombly*. Accordingly, this claim of breach is dismissed.

### 4. Electrical / Water Heater Installation

The same is true for the allegation that the electrical system (or some part of it) and the water heater were constructed without a building permit and in violation of building codes and regulations. The Couturiers do not specify any particular code provisions that were violated or even how they were violated. The Court must deem true all well-pleaded allegations, but those allegations must give rise to a reasonable inference that the defendant committed the alleged wrong. These broad, generalized assertions of improper construction are insufficient; they make wrongdoing possible but not *plausible. See Iqbal*, 556 U.S. at 679. This claim of breach is dismissed.

### 5. Failure to Use Licensed Contractors

Again, the same is true. The Couturiers do not allege which work was done with unlicensed contractors. It is unclear on whose behalf the work was done, and whether before or after the execution of the Purchase Agreement. The nature and scope of the alleged work is also unspecified. This is patently insufficient to survive Rule 12(b)(6) analysis. This claim of breach is dismissed. *See Iqbal*, 556 U.S. at 679.

### 6. Load-Bearing Capacity of the Building

This instance of alleged breach requires more scrutiny. The Couturiers claim that Koval and Invsco "failed to construct the units in accordance with load bearing capacities[.]" (FAC Par. 61.) The Court understands this allegation to relate to the fraudulent concealment claim in that the Couturiers do not refer to the building's initial construction but rather to the installation of some type of unspecified floor covering during the apartment-to-condominium conversion that exceeded the load-bearing capacity of the building. The claim fails to adequately allege, among other things, which part of the Purchase Agreement was violated by allegedly defective flooring and who was responsible for installation of the flooring. Thus, this claim of breach of the Purchase Agreement is dismissed as inadequately pleaded.

### 7. Waiver of Implied Warranties for Residential Properties

The Couturiers are correct that Nevada statutes prohibit a blanket waiver of implied warranties for residential properties. NRS § 116.4115 provides:

> With respect to a purchaser of a unit that may be occupied for *residential* use, *no general disclaimer of implied warranties of quality is effective*, but a declarant and any dealer may disclaim liability in an instrument signed by the purchaser for a specified defect or specified failure to comply with applicable law, if the defect or failure entered into and became a part of the basis of the bargain.

NRS § 116.4114, in turn, defines implied warranties:

> 1. A declarant and any dealer warrant that a unit will be in at least as good condition at the earlier of the time of the conveyance or delivery of possession as it was at the time of contracting, reasonable wear and tear excepted.
>
> 2. A declarant and any dealer impliedly warrant that a unit and the common elements in the common-interest community are suitable for the ordinary uses of real estate of its type and that any improvements made or contracted for by a declarant or dealer, or made by any person before the creation of the common-interest community, will be:

11

      (a) Free from defective materials; and

      (b) Constructed in accordance with applicable law, according to sound standards of engineering and construction, and in a workmanlike manner.

The blanket disclaimers in sections 15.1 and 16 of the Purchase Agreement violate NRS § 116.4115 because they attempt to invalidate the implied warranties provided by NRS § 116.4115(2). The text of the unenforceable disclaimers is as follows:

> **15.1** . . . SELLER SHALL HAVE NO RESPONSIBILITY WHATSOEVER for any alleged constructional defect for or related to the Residence, Property, or other improvements within the Project.
>
> * * *
>
> **16. Seller Warranties.** Seller does not represent to be completely familiar with the Project. Seller . . . makes no warranties or representation at all concerning the Project or the existing improvements thereon, and Purchaser agrees to accept the Property and Common Elements and the related interests. "AS-IS, WHERE-IS, AND WITH ALL FAULTS," AND WITHOUT REPRESENTATION OF ANY SORT OR NATURE. PURCHASER UNDERSTANDS AND AGREES THAT SELLER MAKES, AND SHALL MAKE, NO EXPRESS OR IMPLIED WARRANTY WHATSOEVER.

(Dkt. No. 61 at 51.) This language clearly demonstrates an attempted general disclaimer of implied warranties, and there are no specified defects that form the basis of the bargain that can be excepted. Therefore, the Couturiers enjoy the protections of the implied warranties provided by NRS § 116.4115.

However, the Couturiers are incorrect as a matter of law that the invalid disclaimers amount to breach of contract. The Purchase Agreement includes a severability clause that provides that the remainder of the agreement, after excising the unenforceable provisions, is in full force and effect. (Dkt. No. 61 at 60.)

In sum, the only actionable alleged breach of the Purchase Agreement is against Koval for its alleged failure to pay the lease for the access easement at the Flamingo Road entry.

    E.    **Second Claim for Relief – Breach of Lease Agreements and Furniture Upgrade Agreement**

This claim involves the alleged breaches of three different contracts. The first contract is between the Couturiers and CRS for the three-year lease extension from around March 2007 to

12

March 2010. The second is between the Couturiers and Koval for approximately $30,000 in new furniture and other upgrades. The third is between the Couturiers and Private Residences for the February 1, 2008 "Condominium Resort Lease."

Neither party submitted a copy of the three-year lease extension, but the allegation of its existence is sufficient at this phase. The Couturiers allege that in early 2008, Invsco, CRS, and Gouletas indicated that they were "broke" and could not pay this lease. (FAC Par. 34.) Non-payment of rent is the quintessential breach of a lease agreement. The Couturiers have thus sufficiently pleaded breach of this lease agreement. The claim thus survives.

It is unclear if the next contract, between Couturier and Koval, was memorialized in writing, oral, or implied-in-fact. Nonetheless, the allegations that the Couturiers provided approximately $30,000 to Koval for new furniture and other improvements as part of the overall negotiation for the three-year lease extension is sufficient to plead the existence of this contract. The Couturiers sufficiently plead breach by alleging that (i) Koval never provided any furniture to Unit 7-213; (ii) provided used furniture to Unit 6-323; and (iii) the improvements to Unit 6-323 were defective and of poor workmanship and quality. Although scant in detail, these allegations are barely sufficient to render the alleged wrongdoing by Koval plausible. This claim of breach survives against Koval.

As to the "Condominium Resort Lease," the Couturiers sufficiently allege that Private Residences failed to perform by not paying rent and by not paying the required HOA dues and property taxes. They also allege that Private Residences breached by cancelling without notice. The termination clause provides, in relevant part, that either party may terminate if the other party breaches and fails to cure the breach within 30 days. (Dkt. No. 64-1 at 4.) There is no indication that the Couturiers breached, so Private Residences apparently had no grounds to terminate. This claim survives against Private Residences, the only signatory to this contract.

### F. Third Claim for Relief – Breach of Implied Covenant of Good Faith and Fair Dealing

Under Nevada law, an implied covenant of good faith and fair dealing exists in every contract. *Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 382 (Nev. 1993). "Where the terms of

13

a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (1991).

The Couturiers claim various instances of contract-based bad faith on the part of Koval (in its own stead and through Invsco's actions), Private Residences, and CRS. The vast majority of these instances, however, amount to claims for breach of contract. And breach of contract is not cognizable under the implied covenant of good faith and fair dealing. *Kennedy v. Carriage Cemetery Servs., Inc.*, 727 F. Supp. 2d 925, 929-30 (D. Nev. 2010) ("A bad faith claim . . . does not arise simply from a particularly egregious or willful breach of a contract, as litigants often imply by reflexively pleading bad faith along with nearly every breach of contract claim."). The Couturiers' allegations of the covenant of good faith are either conclusory and unsupported by sufficient detail, or sound in breach of contract or tort. Thus, this claim is dismissed.

### G. Fourth Claim for Relief – Conversion

The Couturiers claim that Invsco, Koval, CRS, and Desmet converted the furnishings and appliances in the Couturiers' condominiums. The Couturiers allege that in September 2007, they discovered that their units did not contain the furniture and appliances they had paid for. Desmet and various unspecified employees of CRS and Invsco allegedly told the Couturiers that their property had been stolen, and advised them to file a police report. The Couturiers further allege that only Desmet and employees of CRS and Invsco had keys to the condos. After the Couturiers complained to Morelli (an Invsco employee), Morelli allegedly supplied poor-quality and damaged furniture to Unit 6-323 and no furniture at all to Unit 7-213. "Defendants have refused and continue to refuse to provide Plaintiffs' personal property[.]" (FAC Par. 100.)

Defendants argue that the Couturiers fail to allege any facts demonstrating that Koval had control over Desmet. Defendants further argue that the Couturiers plead Koval out of this claim by alleging that only Desmet and employees of CRS and Invsco had keys to the unit (implying that Koval did not have keys).

Under Nevada law,

> conversion is defined as a distinct act of dominion wrongfully exerted over personal property in denial of, or inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights. . . . Liability for a claim of conversion is predicated upon an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge.

*Dynamic Transit v. Trans Pac. Ventures*, 291 P.3d 114, 118 (Nev. 2012), *reh'g denied* (Apr. 4, 2013).

This is admittedly a close call, but the Couturiers have sufficiently pleaded this claim against Desmet, Invsco, CRS, and Koval. Although none of the allegations precisely links these defendants to the missing furniture, these defendants were sufficiently involved such that it is plausible that they are liable for conversion. Desmet told the Couturiers that the furniture and appliances were stolen, allegedly in spite of her knowledge that they had never been installed. It is unclear on whose behalf Desmet acted, although presumably not her own as an individual. If the Couturiers can prove that Desmet was an agent or employee of Invsco, CRS, or Koval, then they may be liable for her actions.

Morelli, purportedly an Invsco employee or agent, allegedly supplied inferior furniture to one of the units in response to the Couturiers' complaint. Looking at the First Amended Complaint as a whole, it is plausible that Invsco was acting as Koval's agent for purposes of the furniture upgrade contract. Thus, this claim survives.

### H. Fifth Claim for Relief – Fraudulent Concealment

This claim is newly pleaded in the First Amended Complaint. The Couturiers allege that in 2006 (after execution of the Purchase Agreement in 2005), Invsco (acting as Koval's agent) ordered GC Wallace to undertake an engineering study of the load-bearing capacity of the condominium building. In July 2006, GC Wallace reported that the floor coverings being installed "would compromise the structural design" of the building. (FAC Par. 105.) Invsco's construction manager allegedly explained the problem to Gouletas, who nevertheless, along with Invsco, proceeded to install the floor coverings. The Couturiers claim that Gouletas, Invsco, and Koval (as Invsco's principal) fraudulently concealed the structural problems to induce the Couturiers to "proceed with the purchase of the condominium units under the sale and leaseback

15

program." (FAC Par. 109.) The Couturiers allege that they were not aware of GC Wallace's report until December 2012.

Defendants contend that (i) the Couturiers have not met the heightened pleading standard of Federal Rule of Civil Procedure 9(b); (ii) selling defective real estate "as is" and "with all faults" does not support the required "special relationship" necessary for an omission to amount to fraud; and (iii) the timing of the structural report defeats this claim.

Under Rule 9, fraud must be pleaded with particularity. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Rule 9(b) requires a plaintiff to allege "the who, what, when, where, and how" of the fraudulent conduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). The particularity requirement of Rule 9(b) also applies to state-law causes of action. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).

The suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist. *Villalon v. Bowen,* 273 P.2d 409, 414 (Nev. 1954). To establish fraudulent concealment, a plaintiff must show: "(1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff . . . ; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages." *Dow Chem. Co. v. Mahlum,* 970 P.2d 98, 110 (Nev. 1998), *overruled in part on other grounds by GES, Inc. v. Corbitt,* 21 P.3d 11 (Nev. 2001). A duty to disclose arises "where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." *Epperson v. Roloff,* 719 P.2d 799, 804 (Nev. 1986). Additionally, a "special relationship" between the parties may trigger the duty to disclose. *Mackintosh v. Jack Matthews & Co.,* 855 P.2d 549, 553–54 (Nev. 1993). The duty to disclose may arise "in any

situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Id.* at 553 (internal quotation marks omitted).

The Couturiers' allegations must first overcome the timing problem. The Purchase Agreement was executed in May 2005, and the structural report was not prepared until July 2006. It therefore seems impossible that the Couturiers could have been fraudulently induced to enter into the Purchase Agreement based upon the concealment of the structural report. The Couturiers do not allege that Defendants knew of a potential problem yet purposely waited to procure the structural study until after the Purchase Agreement was signed. The Couturiers admit in their reply that the report came out after the Purchase Agreement, but assert that they had not yet taken possession of the condos. However, the Court cannot rely on factual assertions raised for the first time in the moving papers

Regardless, the study was allegedly ordered no earlier than January 2006. There are apparently no facts to give rise to a reasonable inference that Defendants had any information about the building's structural problems at the time the Purchase Agreement was negotiated and executed. Although the Couturiers mention the lease agreements in reference to this claim, they refer to them as part of the "purchase of the condominium units." In other words, the Couturiers do not allege that the concealment of the structural report induced them to enter the post-July 2006 lease agreements.

Yet Koval does not escape liability so easily. Because the conversion work started before the Purchase Agreement was executed, the Couturiers reasonably believed that the work would be performed according to the building code and all other applicable regulations. If the flooring exceeded the load-bearing capacity of the building, then a building permit should not have issued. The Court presumes that the issuing agency properly reviewed whatever building permit application was before it, leaving the Court to infer that the permit application did not correctly identify the flooring materials, incorrectly calculated the dead load of the new flooring, or was otherwise inaccurate. Alternatively, it is possible that the work was done without a permit. In either event, the special relationship between a real estate seller and buyer plausibly required Koval (or its agent, Invsco) to inform the Couturiers of the problem or the potential problem of

17

which Koval plausibly should have been aware given that the flooring work presumably began before the Purchase Agreement was executed. *See Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1416 (D. Nev. 1995) (recognizing special relationship between real estate buyer and seller under Nevada law).

As to Rule 9(b), the complaint pleads this allegation of fraud with sufficient particularity, albeit barely. The "who" of the fraud is Koval, through Invsco, its agent. The "what" is the knowledge that the new flooring endangered the structural integrity of the building. Although Koval apparently did not have actual knowledge of this problem in May 2005, it plausibly should have taken sufficient steps to learn about it by then. The "when, where, and how" are self-evident in context. As to Koval's defense that the building was sold "as-is," the Court explained above that this attempted disclaimer of implied warranties is invalid under applicable Nevada statutes.

Accordingly, this claim survives.

### I.     Plaintiffs' Motion for Oral Hearing

Finally, the Couturiers' motion for oral argument on the pending motions (Dkt. No. 112) is denied as procedurally improper. The motion for hearing does not require any response, meaning it was improperly submitted as a "Motion." Moreover, this Order renders that motion moot, evidencing the senselessness of the motion. The motion is inappropriate as its filing appears to be intended only to serve as a "reminder" to the Court about the pending motions, motivated by the Plaintiffs' impatience in waiting for a decision.

The Court reminds counsel that a motion requesting the Court to do what it is already required to do under the pretense of judicial economy (or an alleged desire to further explain arguments in a pending motion) is impertinent and exacerbates an overcrowded docket. Oral argument is at the discretion of the Court (Local Rule 78-2), and will be granted if needed. Counsel should not file unnecessary and inappropriate motions that waste already overburdened judicial resources, as it is only adding to the problem, not assisting it. The Court refers counsel to Local Rule 7-6, which outlines the proper mechanisms by which counsel may bring pending matters to the Court's attention to verify that the pending motion has not been miscategorized or otherwise "fallen through the cracks." After utilizing those mechanisms, like all other litigants

the parties must wait while the Court works through its heavy backlog of cases. If the parties and counsel are dissatisfied with this reality, they may (with the blessing of the undersigned) petition Congress for approval of additional judgeships in this district.

### III. CONCLUSION

In accord with the above, the Court hereby ORDERS:

1. The First Claim for Relief is actionable against only Koval for failing to maintain the access easement at the Flamingo entryway. All other claims of breach against all other Defendants are dismissed.

2. As to the Second Claim for Relief, the claim for breach of the three-year lease extension survives as against CRS. The claim for breach of the furniture/upgrade contract survives as against Koval. The claim for breach of the Condominium Resort Lease survives as against Private Residences.

3. The Third Claim for Relief asserting breach of the implied covenant of good faith and fair dealing is dismissed.

4. The Fourth Claim for Relief is actionable.

5. The Fifth Claim for Relief is actionable.

DATED THIS 31st day of March, 2014.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

19